LOTTINGER, Judge.
On January 6, 1956, the plaintiff filed two suits -against the defendant. The first of these, No. 55,377 of the docket of the Lower Court, was for $136.10, together with interest, attorney fees, etc., all in connection with a promissory installment note made by the defendant on July 22, 1955, in the origi-nah amount of $140. The second suit, No. 55,378 of the docket of the Lower Court, *436 was for $235.13, together with interest, attorney fees, etc., all in connection with a promissory installment note made by the defendant on April 9, 1955, in the original amount of $403.08. The suits alleged that the notes were secured by chattel mortgage on a 1947 Cadillac automobile and prayed that its lien on same be recognized and that the car be seized and sold according to law.
The defendant filed answers and recon-ventional demands in both suits which were consolidated for trial. Judgment was ultimately rendered in favor of the plaintiff, as prayed for, and the automobile was advertised and finally sold with appraisement by the Sheriff. The matter is now before us on an appeal taken by the defendant.
There is no dispute as to the defendant’s indebtedness on the notes, the basis of his defense and reconventional demand being that the automobile was seized illegally and that he is entitled to damages therefor.
Mr. Robert M. Webb, Jr., testified that he was employed by plaintiff and called upon the defendant in November of 1955 with respect to his delinquent account on the two notes. His version of what transpired is as follows:
“Q. When you received this assignment what did you do in connection with this account? A. When I first received the account I went to Sanfie’s house and I think we had some arrangement that he was to get the money in something like five or six days, maybe a week, to get the account up to date, then he didn’t come through with his promise and I went to Henry’s Es-so Service Station, I believe it is an Esso Service Station, on Government Street where I knew that Sanfie was employed. At the time he was washing a car and I told Dosie that either he had to have the account up to date and I was to collect the account up to date or store the unit for a period of two weeks or repossess it. Dosie said he would not pay me and then I asked him to sign a release on the car. We had to have a release on the car and he said he wouldn’t sign because he didn’t know what he was signing, we might hold him responsible for the car and he didn’t even have the car, but he gave me the keys and said that was perfectly all right, ‘You just take the car on up there and hold it for two weeks, and if I don’t’ * * *. I told him, ‘Now, if you don’t come in in two weeks we will have to file suit on you to repossess the car plus hold you responsible for the unpaid balance of what the court sells the car for and doesn’t bring.’ Well, Dosie in the period of the two weeks he didn’t come in so that was the last I know of the account, but he gave me the keys, pulled the keys out of his pocket and asked me to bring him a raincoat out of the car and I did, I went and unlocked the car and brought him a raincoat out of his car.
“Q. When you met Dosie Sanfie at this filling station what was he doing? Was he working on * * * A. Washing a car.
“Q. He had the keys in his pocket? A. Right.
“Q. Was the automobile locked or unlocked? A. It was locked.
“Q. And you unlocked the automobile ? A. Right.
“Q. Where was this raincoat? Was it in the car or in the trunk? A. In the back seat of the car I believe, sir. I believe it was * * *. I am not positive if it was in the trunk or in the back seat, I think it was in the back seat.
“Q. In other words, he voluntarily gave you the keys when he said he couldn’t bring the car up to date? A. Right.
“Q. You did not forcibly take the automobile? A. No, sir.
*437 “Q. You had instructions not to take the automobile unless the man surrendered it to you for the purpose of storing it on your lot? A. Right, sir.
“Q. And actually that’s about all you know about it? A. That’s the only thing I know about it, for the period of about 10 days I was working on the account.”
As might be expected, the testimony of the defendant reflects a different version of what occurred. The pertinent part of his testimony is as follows:
“Q. Can you tell us about the day you were out there working at Henry’s Esso Service? A. Yes, sir, the collector came down from Mr. Armstrong’s Loan Service Company and asked me to bring my notes up to date. They only came twice, and during the time, sir, I was sick, with pneumonia and pleurisy, the doctor put me in the bed and I quit my job, I was working down at Godchaux’s Sugar Refinery, I had a good job, and I went to Mr. Armstrong and told him when I was taken sick, I got my brother to take me up there in the car, I couldn’t pay him nothing, I told him my notes would have to be behind until I could catch them up, please, and I offered to pay him as much as $5.00 a week until I get back on my job because the doctor had me in the bed, and he refused, he say he would have to have it all, so what I did, I went to Mr. Henry’s Esso Station and went to work, at $28.00 a week, to give him $5.00 on the loan and he told me he didn’t want it, he wanted it all or the car, so he came, sent the collector down and picked the car up. He came, the collector asked me, he told me he came at the car, and I told him, I said, ‘Well, you came at the car, sir, I don’t have any choice’, he say, ‘What you going to do, why don’t you call him up and talk with him?’, and I say, ‘There ain’t no use. I was there just yesterday, sir,’ and he said, 'Well, I will call him up’, and he went and got on the phone at Mr. Henry’s Esso Station and called him up and what he got from the company, I don’t know sir, but he came back and shook his head and said, ‘Well, I am just going to have to take it,’ and he asked me to sign some papers and I said, ‘No, sir,’ I wouldn’t sign no papers. I say, T don’t know what I am signing for,’ and he says, ‘Well, that’s it, I have orders to pick it up,’ and he walked out and hooked the car up and left with it. I didn’t even go towards the car.
“Q. They took the car off that day ? A. Yes, sir.
“Q. And that was in November? A. November.”
Two witnesses testified on behalf of the defendant, but we find, as apparently the trial judge did, their testimony to be of little value. It is well established that the automobile remained with plaintiff from November, 1955 until January, 1956, when the suits were filed and it was sequestered by the sheriff, during which time the defendant made no attempt to regain possession.
The question presented is purely factual, i. e., whether or not the defendant herein voluntarily surrendered the automobile to plaintiff for the purpose of storage on its lot until the payments were brought current. The automobile remained on plaintiff’s lot for approximately two months and all during that time no payments were made on the notes nor did defendant make any attempt to get his car back. We feel certain that if same had not voluntarily been surrendered for the purpose stated that defendant would have done something about his car. Undoubtedly, the trial judge believed the testimony of Webb rather than *438 that of the defendant and we are unable to find that he erred in doing so. Certainly there is nothing in the record .to show manifest error on his part and, this being the case, the judgment should he affirmed.
Judgment affirmed.